IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARKISHA GORDON                    :
                                   :               CIVIL ACTION
        v.                         :
                                   :               NO. 13-7175
MAXIM HEALTHCARE SERVICES,         :
INC.                               :

**MEMORANDUM**

**SURRICK, J.**                                          **JULY 21 , 2017**

Presently before the Court are Plaintiff's Motion for Certification (ECF No. 73);

Defendant's Motion to De-certify Conditionally Certified Collective Action Class (ECF No.

100); and Defendant's Motion for Summary Judgment (ECF No. 104).  For the following

reasons, Plaintiff's Motion for Certification will be denied, Defendant's Motion to De-certify

Conditionally Certified Collective Action will be granted, and Defendant's Motion for Summary

Judgment will be granted.

## I.      BACKGROUND

This is a purported class action brought under the Fair Labor Standards Act ("FLSA"), 29

U.S.C. § 201, et seq., and the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43

Pa. Cons. Stat. Ann. § 260.1, et seq.  Plaintiff Markisha Gordon brings claims on behalf of

herself and others similarly situated against her former employer, Defendant Maxim Healthcare

Services, Inc.  Plaintiff alleges that Maxim failed to timely pay her and other home healthcare

aides for hours worked.  In December 2014, Judge Harvey Bartle, III granted Plaintiff's motion

to conditionally certify the collective class under Section 216 of the FLSA to include all home

healthcare aides employed by Maxim in Pennsylvania who were paid beyond scheduled pay

dates that fell on or after April 10, 2011.  The case was reassigned to this Court on July 15, 2015. (ECF No. 74.)  As set forth below, the conditional collective class will be decertified, Plaintiff's motion to certify a class under the WPCL will be denied, and Defendant's motion for summary judgment will be granted.

### A.  Factual Background

Plaintiff Gordon worked as a Home Health Aid for Maxim from October 2010 until July 2012.  (Gordon Dep. 18, 36, Pl.'s Class Cert. Reply Ex. L.; Am. Compl ¶ 13; Gordon Decl. ¶ 4, Pl.'s Class Cert Mot Ex. 1.)  In this role, she cared for individuals at their homes and was paid an hourly rate for her time.  (Gordon Dep. 54, 60.)  Plaintiff was based in the Northeast Philadelphia Maxim branch, which is sometimes called the Trevose office.  (Gordon Dep. 84.)

Defendant Maxim is a national staffing company that provides recruiting, staffing, and healthcare services to a variety of clients and industries.  (Smith Decl. ¶ 2, Def.'s Sum. J. Mot. Ex. A.)  The Homecare Division places nurses and other healthcare professionals in individual client homecare settings.  (*Id*. ¶ 3.)  Maxim's "external employees" provide care to clients outside of the office setting and almost exclusively in the homes and facilities of the clients.  (*Id*. ¶ 6.)  Certain external employees provide trained medical care, such as licensed nurses, and other external employees, such as Home Health Aids, provide nonmedical services.  (*Id*.)

During the relevant class period, Maxim employed approximately 12,898 external employees in Pennsylvania.  (*Id*.)  These employees reported to over 180 different supervisors in fourteen separate Maxim Offices located throughout the state.  (*Id*. ¶ 5.) External employees keep track of their time worked by using "weekly notes" or "time sheets." (Smith Decl. ¶ 9.)  The Employee Handbook states that employees must record all regular and overtime hours worked, and that time sheets must be signed by the client or an authorized person

at the client site.  (Employee Handbook 19.)  A weekly note or time sheet permits an external employee to record the precise times that they begin and end working each day, and the exact services that they provided to the client.  (Smith Decl. ¶ 9; Def.'s Class Cert. Resp. Ex. 4.) Sharon Smith, who served as Maxim's Human Resources Business Partner for the Northeast Region, stated that Maxim's timesheets are the only way that the company knows when external employees actually work, since those employees work remotely.  (Smith Decl. ¶ 9.)  Smith stated that the timesheets also serve to ensure that external employees are providing the appropriate services in accordance with the client's plan of care.  (*Id.*)  The Handbook indicates that some local offices have "implemented their own systems for recording the work hours of Maxim staff" and that employees must adhere to the system set up by their local office.  (*Id.*)  The Handbook is silent with respect to how external employees are supposed to report their time to their Maxim office.  (*Id.*; *see also* Smith Dep. 17 (noting that there is no policy for how Maxim employees report time to their individual offices).)  Gordon alleges that Maxim's lack of any policy regarding the reporting of time has caused her and other class plaintiffs to suffer damages.

Maxim's Employee Handbook states that employees will be "paid weekly on Friday for all hours worked during the preceding week."  (Employee Handbook, Pl.'s Class Cert. Mot. Ex. 13.)[1]  The payroll week begins on any given Sunday at 7:00 AM and ends the following Sunday at 6:59 AM.  (*Id.*)

There is no uniform way by which external employees such as home health aides report their time to their Maxim home office.  Gordon claims she was only permitted to hand-deliver her time sheet to the Trevose office, and she presumed that other offices maintained similar requirements.  The evidence reveals that each office employed different practices with respect to

---

[1] From October 2010 until August 2011, Gordon's payday was the first Wednesday after the payroll period.  After August 2011, her payday moved to the first Friday after the pay period.

time reporting, and many offices permitted reporting by various methods.  For example, some offices permitted employees to submit their time sheets using a 24-hour drop box.  (*See* Moore Dep. 46-47, Def.'s Class Cert Resp. Ex. 20; Cruz Dep. 88, Def.'s Class Cert Resp. Ex. 21; Watson Dep. 105, Def.'s Class Cert Resp. Ex. 27.)  Some offices allowed relatives or friends of the external employee to drop off the time sheet to the employee's home office.  (*See* Moore Dep. 36-37; Sall Dep. 120, Def.'s Class Cert Resp. Ex. 29; Reiter Decl. ¶¶ 5, 7, Def.'s Class Cert Resp. Ex. 22.)  Some Maxim offices permitted external employees to mail in their time sheets using a prepaid envelope provided by Maxim.  (*See* Moore Dep. 36; Cruz Dep. 88; Sall Dep. 66; Watson Dep. 105; Arelt Dep. 62-63, Def.'s Class Cert Resp. Ex. 5.)   Some external employees were permitted to fax or e-mail their timesheets to the office.  (*See* Moore Dep. 35, 40; Arelt Dep. 62-63; Pompe Decl. ¶ 5, Def.'s Class Cert Resp. Ex. 31; Barach Decl. ¶ 5, Def.'s Class Cert Resp. Ex. 31.)  Some employees were permitted to report their time over the telephone or through text message.  (*See* Howell Decl. ¶¶ 7-8, Def.'s Class Cert Resp. Ex. 30; Soldavini Decl. ¶¶ 8, 10, Def.'s Class Cert Resp. Ex. 33; Reiter Decl. ¶¶ 6-7; Pompe Decl. ¶ 5; Barach Decl. ¶ 5.)

There was also no uniform way by which external employees were paid for the hours worked after they reported their time.  For example, some external employees, like Gordon, were not paid until they turned in their signed timesheets.  (Gordon Decl. ¶ 11.)  Other external employees who failed to turn in their timesheets by the payroll deadline were paid for the hours they were tentatively scheduled to work.  (*See* Collins Decl. ¶ 10; Holbrook Decl. ¶ 7; Sauder Decl. ¶ 12, Def.'s Class Cert Resp. Ex. 17; Truman Decl. ¶ 4, Def.'s Class Cert Resp. Ex. 18.)  Once they turn in their timesheets, the employees are paid for any time they worked that was in addition to their tentative or scheduled time.  Some offices paid external employees according to their reported time, but then paid for additional time during the following pay period.  (*See, e.g.*,

Tellefsen Decl. ¶ 14, Def.'s Class Cert. Resp. Ex. 8 (stating that there were occasions where she "accidentally misreported the time [she] worked over the phone," but that she would be paid for additional hours in the following paycheck after she corrected her time).

Gordon was advised prior to starting at Maxim that she would be paid on a weekly basis. (Gordon Dep. 54.)  She was required to submit time sheets, which indicated the exact times—to the minute—that she worked for Maxim's clients.  (Gordon Decl. ¶ 4.)  In addition, the client for which Gordon provided care, was required to sign the time sheet and attest to the time Gordon worked.  (*Id.*)  In her declaration, Gordon stated that she was physically required to hand-deliver the time-sheets to the Trevose Office, which was located fifteen miles away from her home, and even further away from some of the job locations.  (*Id.* ¶ 7.)  She would drop off the time sheet on Monday for the prior week.  (*Id.* ¶ 8.)  Gordon did not drive, but instead used public transportation.  In her declaration, she stated that taking the bus from her house to the Trevose Office to drop off her time sheet would take at least one hour and fifteen minutes.  (*Id.* ¶ 9.)  On weeks where she was unable to drop off her timesheet to the Trevose Office on Monday, she would not be paid that week, but instead on the following payday.  (*Id.* ¶ 11.)  At her deposition, Gordon testified that she was also permitted to leave the time sheet in the drop box outside of Maxim's office.  (Gordon Dep. 61.)  In fact, Gordon's husband occasionally dropped off the timesheet in the drop box.  (*Id.* at 118-21.)

Gordon had completed certified nurse's aide ("CNA") training; however, she provided no medical services to the clients during her employment at Maxim.  (Gordon Dep. 18.)  Gordon stated at her deposition that she never provided medical services to clients, and instead provided "companionship services" to Maxim clients.  (*Id.*)  In fact, she was advised during orientation to

provide only companionship services to Maxim's clients, not medical services.  (Gordon Dep. 60-61.)  Gordon provided services in accordance with the client's plan of care.  (*Id*. at 57.)

In support of her request for class certification, Gordon submits the expert report of Colleen S. Vallen, who was retained to provide an opinion about the damages associated with the purported plaintiff class.  Vallen analyzed ADP earning statements for the time period April 2011 through September 2014, and created a "damages model" that purports to analyze the damages associated with all late payments due to Maxim employees.  (*See* Vallen Rept. 8-9, Pl.'s Class Cert. Reply Ex. A.)  Based on payroll records, Vallen compared the actual pay date to the expected pay date of each weekly pay by each external employee, and assumed all employees were paid weekly.  If there was any variance, Vallen considered that variance as a "late" payment which, under her damages model, triggered liquidated damages under the state and federal wage laws.  (*Id*. at 6-7.)  Vallen indicates that the payroll records she received from the parties were "incomplete."  (*Id*.)  Generally, we find Vallen's report and conclusions to be unpersuasive and confusing, and based on multiple inconclusive "assumptions."  Gordon heavily relies on the report to draw legal conclusions as to liability even though Vallen was retained only to create a damages model.

**B.    Procedural History**

On April 9, 2014, Gordon filed an Amended Class Action Complaint, asserting claims for violations of the FLSA and WPCL.  (Am. Compl., ECF No. 21.)[2]  Gordon alleges that Defendant

---

[2] In her original Complaint, which was filed on December 9, 2013, Gordon asserted a different class action theory.  Gordon alleged that Maxim failed to pay her and other class members overtime wages under Pennsylvania, Michigan, Washington, and New York State law.  (ECF No. 1.)  After Maxim provided evidence to Gordon demonstrating that she had always been paid overtime wages, Gordon abandoned this claim, and filed the Amended Complaint, wherein she alleged that she and other class members were paid certain wages after their regularly scheduled payday.

failed to pay its external employees, such as Gordon and the other proposed class members, on its regularly-scheduled payday for work performed during the corresponding pay period, as required by the FLSA and WPCL.  (*Id.*)

On July 15, 2014, a Memorandum and Order were entered granting in part and denying in part Defendant's Motion to Dismiss the Amended Complaint.  (July 15, 2014 Mem., ECF No. 27.)[3]  The Court dismissed Gordon's claim under the WPCL as to any wages due and payable on or before April 9, 2011, based on the statute of limitations.  Maxim's motion to dismiss was denied in all other respects.  (*Id.* at 12.)

On December 11, 2014, Plaintiff's Motion for Conditional Certification with regard to her claims under the FLSA was granted.  (Dec. 11, 2014 Mem., ECF No.  47.)  Judge Bartle granted conditional class certification "only as to all home healthcare aides employed by Maxim in Pennsylvania and who are paid beyond scheduled pay dates that fall on or after April 10, 2011."  (*Id.* at 9.)   Gordon thereafter sent a proposed notice of collective action lawsuit to the purported class under the FLSA.  (ECF No. 53.)  Sixteen individuals opted-in and became Plaintiffs in the FLSA action.  (ECF Nos. 55-72.)  Eight of the opt-in Plaintiffs ultimately refused to appear for a deposition.  As a result, the parties jointly stipulated to the dismissal of those eight opt-in Plaintiffs.  (Stip., ECF No. 92.)  Plaintiff also agreed to withdraw the affidavits and declarations of these opt-in Plaintiffs, as well as the affidavit of Sandra Cataldi, a non-opt-in Plaintiff who refused to appear for a deposition.  (*Id.*)[4]

---

[3] The Memorandum and Order were authored by Judge Bartle.

[4] The remaining opt-in plaintiffs are:  (1) Mary Arelt; (2) Charlotte Brooks; (3) Dayerlyn Cruz; (4) Maritza Lara; (5) Ebony Moore; (6) Mohamed Sall; (7) Robin Scott; and (8) Kirah Watson.

Gordon filed the instant Motion for Class Certification on June 8, 2015.  (Pl.'s Class Cert. Mot., ECF No. 73.)  Defendant filed a Response in Opposition and Motion to De-Certify Conditionally Certified Collective Action Class on February 5, 2016.  (Def.'s Class Cert. Resp., ECF No. 100.)  Gordon filed a Reply.  (Pl.'s Class Cert. Reply, ECF No. 107.)  Defendant also filed a Reply in support of its Motion to De-Certify.  (Def.'s Class Cert Reply, ECF No. 115.)  Maxim then filed a Motion for Summary Judgment (Def.'s Sum. J. Mot., ECF No. 104), to which Plaintiff filed a Response (Pl.'s Sum. J. Resp., ECF No. 108), and Defendant filed a Reply (Def.'s Sum. J. Reply, ECF No. 114.)

Each Motion is governed by a different legal standard.  Accordingly, we discuss them separately.  However, we initially note that Gordon's theory of this class action has changed dramatically over the course of the litigation.  Originally, Gordon alleged that Maxim failed to provide overtime pay to her and other putative class members.  After Maxim presented evidence that this was not the case, Gordon's theory—as expressed in the Amended Complaint—changed.  In the Amended Complaint, Gordon argued that Maxim's burdensome and unlawful policy of requiring external employees to hand-deliver timesheets that were signed by clients caused late payments of wages in violation of the FLSA and WPCL.  Again, Maxim presented evidence that this was not the case.  Many supervisors permitted their external employees to report their time in various other ways, such as by fax, via text message, and by sending in the time sheets.  Presented with this evidence, Gordon's theory again changed.  She now alleges that simply because external employees were paid for certain hours in subsequent pay periods, Maxim has violated the FLSA and WPCL.  She fails to allege any overarching Maxim policy that creates these violations.  As discussed below, Plaintiff's theory does not support class certification of either her WPCL or FLSA claims.

## II.  PLAINTIFF'S MOTION TO CERTIFY CLASS UNDER THE WPCL

Plaintiff seeks to certify the following class under Rule 23(b)(3) of the Federal Rules of

Civil Procedure:

> All persons who were employed by Maxim and who were not (i) paid timely
> during their regular pay week more than twice in a calendar quarter year where
> their amount owed was in excess of 5% of their amount owed for that pay or (ii)
> whose wages remained unpaid for thirty (30) days beyond the regularly scheduled
> payday, at any time from April 11, 2011 to the present.

(Pl.'s Mot. Class Cert., ECF No. 73.)  Plaintiff states that the issue in this class action is whether

Maxim's practice of paying Plaintiff and the proposed class their earned wages beyond their

regularly scheduled payday is a violation of the WPCL, which entitles the class to liquidated

damages.

### A.  Legal Standard

A class action is "an exception to the usual rule that litigation is conducted by and on

behalf of the individual named parties only." *Comcast v. Behrend*, 133 S. Ct. 1426, 1432 (2013)

(citation omitted).  "Class certification is proper only if the trial court is satisfied, after a rigorous

analysis, that the prerequisites of Rule 23 are met." *In re Hydrogen Peroxide Antitrust Litig.*,

552 F.3d 305, 309 (3d Cir. 2008) (footnote and quotation marks omitted).

The Third Circuit has recently clarified how a district court should conduct its "rigorous

analysis." *See Reyes v. Netdeposit, LLC*, 802 F.3d 469, 484 (3d Cir. 2015).  The Court stated

that "[i]n conducting its inquiry, a district court must rigorously assess the available evidence

and the method or methods by which plaintiffs propose to use the evidence to prove impact at

trial." *Id.* (citation and internal quotation marks omitted).  This "may require the district court to

'delve' behind the pleadings" and "resolve all factual or legal disputes relevant to class

certification even if they overlap with the merits—including disputes touching on elements of the

cause of action." *Id*.  The Third Circuit ultimately concluded that in analyzing class certification under Rule 23, the district court must:

> (1) conduct rigorous analysis, (2) review all avenues of inquiry in which it may have doubts (even if it requires reviewing the merits) in order to (3) be satisfied and (4) make a definitive determination on the requirements of Rule 23, or even (5) require that a plaintiff demonstrate actual, not presumed conformance with Rule 23 requirements.

*Id*. at 485.

Plaintiff, as the party seeking class-action certification, bears the burden of "demonstrating by a preponderance of the evidence her compliance with the requirements of Rule 23." *Byrd v. Aaron's Inc*., 784 F.3d 154, 163 (3d Cir. 2015).  Plaintiff's burden is a heavy one. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." (emphasis omitted)).

### B.     Discussion

Class certification under Rule 23 has two components.  The party seeking class certification must first establish the four requirements of Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see also In re Hydrogen Peroxide Antitrust Litig*., 552 F.3d at 309 n.6.

"If all four requirements of Rule 23(a) are met, a class of one of three types (each with additional requirements) may be certified" under Rule 23(b).  *In re Hydrogen Peroxide Antitrust Litig*., 552 F.3d at 309 n.6.  Plaintiff seeks certification under Rule 23(b)(3), which states that

"[a] class action may be maintained if Rule 23(a) is satisfied and if:  (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  These are known as the predominance and superiority factors of Rule 23(b)(3).

Plaintiff and Defendant dispute each of the factors of Rule 23(a) and (b)(3).   We will address each factor below.

1.      *Rule 23(a) Requirements*

a.      <u>Numerosity</u>

Plaintiff must first demonstrate that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40," the numerosity requirement "has been met."  *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001).

Citing the Report of Colleen Vallen, Plaintiff states that the putative class consists of 3,157 Maxim employees who were not timely paid during the relevant class period.  Defendant does not dispute Plaintiff's representation of the size of the putative class.  Instead, Defendant contends that Plaintiff has failed to demonstrate that joinder is impracticable by comparing the proposed putative class in this WPCL class action to the class in the FLSA collective action. After the FLSA class was conditionally certified, only sixteen out of 538 putative class members opted in to the class.  Defendant contends that this reveals a lack of interest on the part of putative class members to participate in Plaintiff's class action.  Defendant's argument ignores the differences between the two putative classes.  The conditionally certified class in the FLSA

action is much narrower as it involves only home health care aides.  The putative class size in the

WPCL action includes all Maxim employees.  We are satisfied that Plaintiff has established the

numerosity requirement.

          b.    <u>Commonality</u>

Plaintiff must also demonstrate "questions of law or fact common to the class."  Fed. R.

Civ. P. 23(a)(2).[5]  "Commonality does not require perfect identity of questions of law or fact

among all class members.  Rather, 'even a single common question will do.'"  *Reyes*, 802 F.3d at

486 (quoting *Wal-Mart Stores, Inc*., 564 U.S. at 359) (quotation marks and alterations omitted).

This is generally not a high burden to meet.  *See id*. (citing *Rodriguez v. Nat'l City Bank*, 726

F.3d 372, 382 (3d Cir. 2013)).  However, the Supreme Court has warned that the language of the

rule is "easy to misread, since any competently crafted class complaint literally raises common

questions."  *Wal-Mart, Inc*., 564 U.S. at 349 (citation and internal quotation marks omitted).

Plaintiff, therefore, must "demonstrate that the class members have suffered the same injury,"

which does not necessarily "mean that they have all suffered a violation of the same provision of

law."  *Id*. at 349-50.  "A court's focus must be 'on whether the defendant's conduct is common

as to all of the class members.'"  *Id*. (citing *Sullivan v. DB Invs., Inc*., 667 F.3d 273, 298 (3d Cir.

2011)).  In other words, the class members' "claims must depend upon a common contention . . .

_____

       [5] Many courts discuss the commonality requirement together with the predominance
requirement of Rule 23(b)(3) since the two requirements are often described as "counterparts" to
each other.  *See Coleman v. Commw. Land Title Ins. Co*., 318 F.R.D. 275, 283 (E.D. Pa. 2016);
*see also Reyes*, 802 F.3d at 486 ("It is often appropriate to discuss commonality and
predominance together because the commonality inquiry is subsumed into the predominance
inquiry.");  *Sullivan v. DB Invs., Inc*., 667 F.3d 273, 297 (3d Cir. 2011) ("Parallel with Rule
23(a)(2)'s commonality element, which provides that a proposed class must share a common
question of law or fact, Rule 23(b)(3)'s predominance requirement imposes a more rigorous
obligation upon a reviewing court to ensure that issues common to the class predominate over
those affecting only individual class members.").  For purposes of simplicity, we discuss the
requirements separately.  However, we note that Plaintiff has failed to meet her burden in
demonstrating that either requirement has been satisfied.

[which] is capable of classwide resolution." *Id*. at 338.  This "means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*.

Plaintiff contends that commonality is met because she and the proposed class share a common question of fact and a common question of law—namely whether they were timely paid their wages on the scheduled payday, and whether they are entitled to liquidated damages as a result.  (Pl.'s Class Cert. Reply 26-27.)   In support of this, Plaintiff points to the report of her expert, Colleen Vallen.  Vallen analyzed the ADP earning statements for the time period April 2011 through September 2014, and created a "damages model" that purports to analyze the damages associated with all late payments due to Maxim employees.  Plaintiff argues that because certain external employees received some or all of their payment beyond their regularly scheduled pay date, Maxim is in violation of the WPCL.  Plaintiff contends that the common inquiry is simply whether purported class action plaintiffs are entitled to liquidated damages for late payments.

Plaintiff's argument ignores the evidence in the record.  As set forth in more detail below, *see Infra* at Section II.B.2.a, there were many lawful reasons why external employees were paid for some hours in subsequent weeks.  For example, external employees at times had standing agreements with Maxim to be paid biweekly instead of weekly, or to be paid in subsequent pay periods.  Other external employees received wages for their scheduled time, but then also received wages for any additional hours they reported on their timesheet in subsequent pay periods.  Despite these agreements, or understandings between employee and employer, these employee payments are deemed "late" and are encompassed in the "damages model" created by Vallen.  The "damages model" is the only common proof submitted by Plaintiff to support her

theory.  However, the model does not take into consideration that certain "late" payments were justified, and at times, requested by the putative plaintiffs.  Determining whether each "late" payment was justified would require individual inquiries into each payment and each putative plaintiff.  This is fatal to establishing commonality.  *See Jarosz v. St. Mary Med. Ctr.*, No. 10-3330, 2014 U.S. Dist. LEXIS 133218, at *26-27 (E.D. Pa. Sept. 22, 2014) (finding that lead plaintiff failed to establish commonality element because individual inquiries would have been required to establish liability).

c.   Typicality

To satisfy the third requirement of Rule 23(a), Plaintiff must show that her claims and defenses are "typical of the claims and defenses of the class."  Fed. R. Civ. P. 23(a)(3).  A district court should determine "whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class."  *Beck v. Maximus, Inc.*, 457 F.3d 291, 295-96 (3d Cir. 2006); *see also Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985) ("[T]ypicality entails an inquiry whether the named plaintiff's individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." (citation and internal quotation marks omitted)).  In addition, "[f]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory."  *Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994) (citation omitted).

Plaintiff contends that typicality is met because Gordon's claims and the claims of the purported class "arise from the same practices and course of events."  (Pl.'s Class Cert. Mot. 17.)  Plaintiff also contends that the claims are typical because they all focus on the legal question of

whether class plaintiffs are entitled to liquidated damages.  Plaintiff's theory that the ultimate question of liability satisfies the typicality requirement is overly broad and unworkable.  In any event, as the evidence shows, the class plaintiffs' claims did not "arise from the same practices and course of events."  Defendant had a variety of means of accepting time sheets for purposes of payroll.  Some putative class members like Plaintiff were not paid until they handed in their time-sheet.  Other class members were paid on their regularly scheduled payday according to their scheduled hours; however, they were paid additional amounts in later paychecks if their time sheets reflected additional time worked than what was scheduled.  Plaintiff has failed to meet her burden in establishing that the typicality requirement is met.

   d. <u>Adequacy</u>

  To meet the fourth requirement of Rule 23(a), Plaintiff must show that she "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This requirement concerns both:  (1) the "experience and performance of class counsel"; and (2) the "interests and incentives of the representative plaintiff[]."  *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181 (3d Cir. 2012) (citation omitted).  Here, Defendant does not challenge the experience and performance of class counsel.  Defendant does, however, contend that Plaintiff is not an adequate class representative.  The second prong of the adequacy inquiry seeks to assure "that the named plaintiff's claims are not antagonistic to the class."  *Beck*, 457 F.3d at 296.

  Defendant contends that Plaintiff is uninterested in serving in the roll as the class representative because she testified during her deposition that she seeks her own private damages.  Defendant also argues that Plaintiff lacks credibility because she stated in her affidavit that she was required to personally hand-deliver her time sheet to the Maxim office; however, she stated in her deposition that she or her husband would sometimes place time sheets in a drop

box outside of the Maxim Trevose office. We are not persuaded that Plaintiff's inconsistent statements and interest in recovering damages precludes her from serving as a class representative. Plaintiff has satisfied the adequacy requirement of Rule 23(a)(4). However, having not met the typicality and commonality factors, Plaintiff's request for class certification must fail. We will nevertheless examine the factors under Rule 23(b)(3).

2.      *Rule 23(b)(3) Requirements*

In addition to establishing the four factors under Rule 23(a), a plaintiff seeking class certification must also show (1) that "questions of fact common to class members predominate over any questions affecting only individual members," (the "Predominance Factor") and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" (the "Superiority Factor"). Fed. R. Civ. P. 23(b)(3).

a.      Predominance

To comply with Rule 23(b)(3), Plaintiff must establish that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The predominance inquiry assesses "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The same "rigorous analysis" standard that applies to class certification under Rule 23(a) applies to the predominance requirement under Rule 23(b)(3). *Behrend*, 133 S. Ct. at 1432. "If anything, Rule 23(b)'s predominance criterion is even more demanding than Rule 23(a)." *Id.*

We must begin the predominance inquiry by looking at the elements of Plaintiff's underlying WPCL claim. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("Considering whether questions of law or fact common to class members predominate

begins, of course, with the elements of the underlying cause of action." (internal quotation marks omitted)); *In re Modafinil Antitrust Litig*., 837 F.3d 238, 260 (3d Cir. 2016) (stating that the predominance inquiry "is especially dependent upon the merits of a plaintiff's claim, since the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual."). In this regard, Plaintiff "must demonstrate that the element of the [claim] is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 600 (3d Cir. 2012). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citation and internal quotation marks omitted). Plaintiff must not only show that the claims of all class plaintiffs are "capable of proof at trial through common evidence" but she must also show that the "damages are measurable on a classwide basis." *Reyes*, 802 F.3d at 481 n.12 (citing *Behrend*, 133 S. Ct. at 1430, 1432-33).

In her Amended Complaint, Plaintiff alleges that Defendant violated 43 P.S. § 260.3, which requires employers to pay their employees on regular paydays. The statute states that:

> Every employer shall pay all wages, other than fringe benefits and wage supplements, due to his employes on regular paydays designated in advance by the employer. Overtime wages may be considered as wages earned and payable in the next succeeding pay period. All wages, other than fringe benefits and wage supplements, earned in any pay period shall be due and payable within the number of days after the expiration of said pay period as provided in a written contract of employment or, if not so specified, within the standard time lapse customary in the trade or within 15 days from the end of such pay period.

43 P.S. § 260.3. The WPCL also provides that certain violations of this provision entitle the employee to liquidated damages. Specifically, 43 P.S. § 260.10 states:

> Where wages remain unpaid for thirty days beyond the regularly scheduled payday, _or_, in the case where no regularly scheduled payday is applicable, for sixty days beyond the filing by the employe of a proper claim or for sixty days beyond the date of the agreement, award or other act making wages payable, _or_ where shortages in the wage payments made exceed five percent (5%) of the gross wages payable on any two regularly scheduled paydays in the same calendar quarter, *and* no good faith contest or dispute of any wage claim including the good faith assertion of a right of set-off or counter-claim exists accounting for such non-payment, the employe shall be entitled to claim, in addition, as liquidated damages an amount equal to twenty-five percent (25%) of the total amount of wages due, or five hundred dollars ($ 500), whichever is greater.

43 P.S. § 260.10 (emphasis added).  To recover liquidated damages under the WPCL, Plaintiff must offer evidence supporting one of the three conditions separated by the conjunction "or," as well as evidence showing that the employer did not act in good faith.  *See Andrews v. Cross Atl. Capital Partners, Inc.*, 2017 Pa. Super. LEXIS 184, 24-25 (Pa. Super. Ct. Mar. 21, 2017) (noting that the "liquidated damages provision is available to only a subset of those prevailing plaintiffs who can also prove that they are entitled to damages as a result of an employer having no good faith defense to wages remaining unpaid for a set amount of time under the statute").

Plaintiff seeks to certify a class using the first and third provisions separated by the conjunction "or" of Section 260.10.  Specifically, Plaintiff's purported class consists of "all persons who were employed by Maxim and who were not paid timely during their regular pay week more than twice in a calendar quarter year where their amount owed was in excess of 5% of their amount owed for that pay or (ii) whose wages remained unpaid for thirty (30) calendar days beyond the regularly scheduled payday, at any time from April 11, 2011 to the present."  (Pl.'s Class Cert. Mot. 1.)  Generally, Plaintiff alleges that many Maxim employees were not receiving all or a portion of their earned pay on their regularly scheduled payday, in violation of Section 260.3 of the WPCL.

Defendant argues that the predominance element is not met because: (1) individual determinations about whether each putative class member had an employment contract with Defendant predominates over common issues; (2) individual determinations concerning why certain employees were paid beyond the next regularly scheduled payday predominate over any claimed common issues; and (3) individual determinations as to whether Maxim had knowledge about the actual hours worked by each external employee predominate over common issues.

With respect to the first argument, Defendant contends that Plaintiff has failed to show common evidence establishing that Maxim external employees had employee contracts with Maxim. To maintain a class action, Plaintiff must present common evidence showing a contractual right to receive wages as an element of her underlying WPCL claim. *Braun v. Wal-Mart Stores, Inc*., 24 A.3d 875, 954 (Pa. Super. Ct. 2011) (stating that to recover damages, "the employee must aver a contractual entitlement to compensation from wages and a failure to pay that compensation" (citation and internal quotation marks omitted)). This is because the WPCL "does not create an employee's substantive right to compensation; rather, it only establishes an employee's right to enforce payment of wages and compensation to which an employee is otherwise entitled by the terms of an agreement." *Banks Eng'g Co. v. Polons*, 697 A.2d 1020, 1024 (Pa. Super. Ct. 1997); *Oberneder v. Link Computer Corp.*, 696 A.2d 148, 150 (Pa. 1997); *see also Hartman v. Baker*, 766 A.2d 347, 352 (Pa. Super. Ct. 2000) ("The underlying purpose of the WPCL is to remove some of the obstacles employees face in litigation by providing them with a statutory remedy when an employer breaches its contractual obligation to pay wages." (citation omitted)); *Hartman*, 766 A.2d at 352; *Braun*, 24 A.3d at 954; *Weldon v. Kraft, Inc*., 896 F.2d 793, 801 (3d Cir. 1990); *Senti v. NCR Comten, Inc*., 619 F. Supp. 1577, 1579 (E.D. Pa. 1985).

There is no dispute that Plaintiff and other class members did not sign a written employment contract with Maxim.  However, this is not the end of the inquiry.  Pennsylvania courts and the Third Circuit permit WPCL claims to be based on implied oral contracts between the employee and employer.  *Braun*, 24 A.2d at 954 ("Absent a formal employment contract or collective bargaining agreement, an employee raising a WPCL claim would have to establish at a minimum, an implied oral contract between the employee and the employer." (citing *De Asencio v. Tyson Foods, Inc*., 32 F.3d 301, 309 (3d Cir. 2003))).   Under Pennsylvania law, an implied contract "has the same legal effect as any other contract" and "differs from an express contract only in the manner of its formation."  *Ingrassia Construction Co., Inc. v. Walsh*, 486 A.2d 478, 483 n.7 (Pa. Super. Ct. 1984).  An implied contract "arises when parties agree on the obligation to be incurred, but their intention, instead of being expressed in words, is inferred from the relationship between the parties and their conduct in light of the surrounding circumstances." *Oxner v. Cliveden Nursing & Rehab. Ctr. PA, L.P*., 132 F. Supp. 3d 645, 649 (E.D. Pa. 2015) (citation omitted).  In the employment context, "a promise to pay the reasonable value of the service is implied where one performs for another, with the other's knowledge, a useful service of a character that is usually charged for, and the latter expresses no dissent or avails himself of the service."  *Stephan v. Waldron Elec. Heating & Cooling LLC*, 100 A.3d 660, 669 (Pa. Super. Ct. 2014) (quoting *Martin v. Little, Brown and Co*., 450 A.2d 984, 987 (Pa. Super. 1981)).

Plaintiff contends that the facts demonstrate the existence of a uniform implied contract between Maxim and the Plaintiff class, under which external employees would perform their scheduled services in exchange for weekly wages.  Judge Bartle reached a similar conclusion in rejecting Defendant's motion to dismiss Plaintiff's WPCL claim.  Defendant had argued that

Plaintiff failed to allege the existence of any employment contract under which WPCL-protected wages are due. Judge Bartle concluded that:

> Although Gordon did not work for Maxim according to the terms of any written agreement, she has averred that she provided services as a home healthcare aide in exchange for wages to be paid according to a week-long pay period, the payday for which followed in the next week.

(July 15 Mem. 8.)

Plaintiff has presented common evidence that supports a finding that the Class plaintiffs provided services in exchange for wages that were paid weekly on a designated payday. The Employee Handbook also states that "[t]he payroll week begins on Sunday at 7:00 AM and ends the following Sunday at 6:59 AM. Employees are paid weekly on Friday for all hours worked during the preceding week. Certainly, an implied contract can be inferred from the relationship between the external employees, who are paid on a weekly basis for hours worked the prior week, and Maxim who received the benefit of those services. *See Martin*, 450 A.2d at 987 ("When a person requests another to perform services, it is ordinarily inferred that he intends to pay for them, unless the circumstances indicated otherwise."). Accordingly, Defendant's first argument—that Plaintiff has failed to show that the putative class members have a contractual right to wages—is rejected.

Defendant's second argument is that the predominance element is not met because numerous individual determinations must be made regarding why certain employees were paid beyond the next regularly scheduled payday. Defendant contends that there are many lawful reasons why individual class members received payment beyond their scheduled payday—in addition to, presumably, unlawful ones—and, as a result, liability can only be determined after assessing each individual and each payment. For example, some employees requested pay days that were later than the pay days of other employees in their office. In addition, some external

21

employees were paid for the hours that they were scheduled to work, or that they reported on their timesheet, but received supplemental payments in later pay periods when they reported additional hours.   Plaintiff responds that the reasons for the late payments do not foreclose a WPCL claim.[6]

The evidence reflects that there was no uniform method for the payment of wages to Maxim employees.  Each of the fourteen Maxim offices had the discretion to set up their own payroll practices.  Some offices allowed employees to report hours over the phone, and those employees were paid in accordance with those reported hours, only to be paid additional monies in subsequent paychecks for supplemental time reported on their actual timesheets.  (*See* Tellefsen Decl. ¶ 14.)  Payroll managers in some Maxim offices testified that they paid external employees according to their scheduled time, and then paid the employees for any additional time worked once the employees turned in their actual time sheets.  (*See* Sauder Decl. ¶ 16; Collins Decl. ¶ 10 (stating that "if external employees do not report their time by the payroll run, my office will pay them for all hours they are scheduled to work based on their client's schedule . . . . When external employees finally do turn in their timesheets, we will pay them in their next paycheck for any additional hours reported that were not reflected in the schedule").)  Under these circumstances, the additional time reported after payroll would be captured as late payments in Plaintiff's damages model.

The evidence also reflects that some external employees at Maxim actually requested to be paid on alternate schedules.  For example, certain employees have "long-term standing agreements" with Maxim, under which they are paid on a different schedule.  (Schafer Dep., 114,

---

[6] Plaintiff's original theory of the case was that external Maxim employees were often paid late because they were required to hand-deliver their time-sheets within difficult-to-meet time constraints.  The evidence in the record refutes this theory, and reflects that there was no uniform method by which Maxim Employees reported their time.

Pl.'s Class Cert. Reply Ex. C.)  One external employee who works in the same office as Plaintiff requested that she get paid for her hours in the following pay period so that she had more time to submit her timesheet.  (Aliu Decl. ¶ 6, Def.'s Class Cert. Resp. Ex. 2 (explaining that she requested an alternative pay schedule and does not consider her paycheck to ever be "late").)  Another external employee requested to be paid for her work hours from Monday to Thursday afternoon on the next regularly scheduled payday, but be paid her hours from Thursday evening through Sunday on the following payday.  (See Bargerstock Decl. ¶¶ 8-9, Def.'s Class Cert. Resp. Ex. 36.)  In fact, numerous purported class plaintiffs had these standing agreements with Maxim, under which they would be paid every week, but for time that was worked two weeks earlier instead of time worked that immediately prior week.[7]

Under Plaintiff's damages model, these individuals are noted as receiving late payments each week despite their standing agreement with Maxim.  Plaintiff contends that any external employee with a "standing agreement" to be paid on an alternate date is not, by definition, a class member, and should therefore be excluded from the putative class.  The problem with Plaintiff's argument is that there is no easy way to ascertain from the common evidence which

---

[7]  The record, which includes numerous declarations and deposition transcripts, corroborates the different arrangements Maxim had with external employees on the timing of their payments.  (See Write Decl. ¶ 14, Def.'s Class Cert. Resp. Ex. 7; Saunder Decl. ¶ 20, Def.'s Class Cert. Resp. Ex. 17 (stating that employee requested a Thursday-Friday pay schedule as opposed to Sunday-Saturday schedule, resulting in some pay checks containing hours worked during the prior pay period); Collins Decl. ¶ 14, Def.'s Class Cert. Resp. Ex. 6; Hensler Decl. ¶ 15, Def.'s Class Cert. Resp. Ex. 13 (noting that one employee in Williamsport office requested to be paid every other week); Ndukwe Decl. ¶ 16, Def.'s Class Cert Resp. Ex. 14 (noting that external employees specifically request payment every other week).)  In addition, multiple external employees testified that although there was no standing agreement in place, they often requested that they be paid for their hours worked in subsequent paychecks because they did not want to report their hours by the payroll deadline.  (See, e.g., Howell Decl. ¶ 8, Def.'s Class Cert. Resp. Ex. 30; Soldavini Decl. ¶ 11, Def.'s Class Cert. Resp. Ex. 33; Moss Decl. ¶¶ 10-11, Def.'s Class Cert. Ex. 37.)

external employees have standing agreements with Maxim.[8]   There is also no easy way to

determine which payments were simply corrections from an earlier wage payment.[9]   It would

require an individual assessment of each late payment to determine whether that employee had a

standing agreement with Maxim to be paid on an alternate schedule.  Such individual

determinations are inconsistent with proceeding as a class action.  *See Newton v. Merrill Lynch,*

*Pierce, Fenner & Smith, Inc*., 259 F.3d 154, 172 (3d Cir. 2001) ("If proof of the essential

elements of the cause of action requires individual treatment, then class certification is

unsuitable." (citation omitted)); *Holmes v. Pension Plan of Bethlehem Steel Corp*., 213 F.3d 124,

137-138 (3d Cir. 2000) (affirming denial of class certification where "the issue of liability itself

requires an individualized inquiry into the equities of each claim").  In other words, there is no

class-wide mechanism to determine the reason any putative class member was paid late on any

given occasion.  The reason could be that the putative class member agreed to an alternate

_____

[8] Plaintiff contends that any employees with standing agreements to be paid on
alternative schedules can easily be determined from the payroll journaling software, and
excluded from the putative class and from the damages model.  However, Plaintiff did not
explain how these individuals could be easily ascertained from the common evidence provided.
In fact, a member of the payroll department testified that the only way to determine which
employees agreed to various payment arrangements is to look at each note that is written for each
external employee in the payroll software.  (Schafer Dep. 116 (stating that she would "have to go
into the journaling software and read every entry and then figure out whether that entry
documents a specific arrangement either for a week of for the tenure of the employee's
appointment with Maxim").)

[9] Plaintiff contends that one could simply look at payroll records and determine whether a
payment was a correction from a prior week, or rather a "late" payment in violation of the
WPCL.  (*See* Pl.'s Class Cert. Reply 12.)  Plaintiff fails to explain how one would accomplish
this task.  Reviewing the payroll records provided by Plaintiff (*see* Pl.'s Class Cert. Reply Ex. I),
the Court is perplexed by Plaintiff's suggestion.  In any event, reviewing each payroll record and
each payment alleged as "late" to determine which should be excluded as a "correction" is
exactly the type of individualized inquiry that is incompatible with class certification.  *See Hayes
v. Wal-Mart Stores, Inc*., 725 F.3d 349, 359 (3d Cir. 2013) ("[T]he predominance requirement
focuses on whether essential elements of the class's claims can be proven at trial with common,
as opposed to individualized, evidence." (citation omitted)).

schedule, or that she reported additional time after payroll had completed.  Plaintiff has presented

no common evidence or proof that can determine whether payments were late for reasons that

are in violation of the WPCL or for perfectly legal reasons.

Plaintiff argues that standing agreements by certain Maxim employees to be paid on

alternative schedules cannot serve as a viable defense to a WPCL class action because the statute

forbids the waiver of right to payment.  (Pl.'s Class Cert. Reply 8.)  Plaintiff relies on Section

260.7, which states that "[n]o provision of this act shall in any way be contravened or set aside

by a private agreement."  43 P.S. § 260.7.  Plaintiff contends that the WPCL requires that

"wages" be paid on a designated payday, *see* 43 P.S. § 260.3, and that this requirement cannot be

waived by a separate employee agreement.  Plaintiff misconstrues the nature of the WPCL,

which does "not create a right to compensation."  *Antol v. Esposto*, 100 F.3d 1111, 1117 (3d Cir.

1996) (citation omitted).  Rather, the WPCL "provides a statutory remedy when the employer

breaches a contractual obligation to pay earned wages."  *Id*. (citation omitted).  The agreement

reached between the employer and the employee governs.  *Id*. (citation omitted).  Maxim reached

alternative payment schedule agreements with a number of external employees.  These

agreements control.

Finally, Defendant argues that predominance is not met because individual

determinations must be made as to whether Maxim had knowledge of the actual hours worked by

external employees.  The time periods actually worked by Maxim external employees often

differs from the schedule Maxim provides to the external employees.  Often, the client's needs

change, requiring an external employee to modify their time working for that client.  (*See*

Schafer Decl. ¶ 10 (explaining that "some clients prefer to have flexible care schedules and ask

their caregivers to come at different times than what was previously scheduled").  When this

occurs, there are times when neither the client nor the Maxim employee informs the payroll

specialist of the time changes until the changes appear on the employee timesheets.  (*See* Sauder

Decl. ¶ 16 ("For example, if employees pick up unscheduled shifts, or their shifts end later than

scheduled, my office has no way of knowing about this additional work until the external

employees report this time to us.").   If the timesheets are turned in after the payroll has ended,

the payment would be included in the following pay week, and be considered "late" under

Plaintiff's damages model.  Defendant contends that it would be unfair to penalize it for this late

payment when it had no knowledge about the additional hours reported by the external

employee.

Defendant is only responsible to pay wages for an employee's work of which it has actual

or constructive knowledge.  *See Alers v. City of Phila.*, 919 F. Supp. 2d 528, 559 (E.D. Pa. 2013)

("While an employer must pay for work it suffers or permits, an employer cannot suffer or

permit an employee to perform services about which the employer knows nothing." (citing

*Holzapfel v. Town of Newburgh*, 145 F.3d 516, 524 (2d Cir. 1998))); *see also Oxner*, 132 F.

Supp. 3d at 649 (noting that an implied contract for wages exists "where one performs for

another *with the other's knowledge*, a useful service . . . ." (emphasis added)).  Plaintiff does not

dispute that the class claims are contingent on Defendant's knowledge of the hours worked by

external employees.

Plaintiff contends that Maxim had constructive knowledge of the hours worked because

Maxim set the schedule, and any changes to that schedule had to be reported to Maxim.  Whether

or not there was a requirement that alterations to schedules had to be reported to, and approved

by, Maxim, the evidence in the record demonstrates that numerous Maxim employees repeatedly

changed their schedule in accordance with the client's needs and did not notify Maxim until

26

turning in their timesheet.  (*See* Beck Dep. 76-77, Def.'s Class Cert. Reply Ex. 1 (stating that she frequently worked different hours than she was scheduled to work and did not notify Maxim of these changes until submitting her timesheet)); Collins Decl. ¶¶ 8-10 (stating that if an external employee does not turn in a timesheet, they are paid in accordance with the hours they were scheduled to work, and then paid for any additional hours reported on their timesheet in the subsequent pay week).

Based on this evidence, the only way for the Court to determine whether Maxim had knowledge of the actual hours worked by an external employee is to make individual inquiries with respect to each external employee and each alleged "late" payment.  These individual determinations clearly weigh against class certification.  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311 ("If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." (citation omitted)).  After a thorough review of the record, we are satisfied that Plaintiff's motion to certify a class action under the WPCL must be denied because common issues do not predominate.  *See In re Morgan Stanley Smith Barney LLC Wage & Hour Litig.*, No. 11-3121, 2016 U.S. Dist. LEXIS 48648 (D.N.J. Apr. 11, 2016) (denying class certification of state law and FLSA claims where common issues do not predominate); *Kuznyetsov v. W. Penn Allegheny Health Sys.*, No. 10-948, 2011 U.S. Dist. LEXIS 146056, at *24-26 (W.D. Pa. Dec. 20, 2011) (denying class certification because whether the defendants had knowledge about the employees' work during lunch breaks was an "individualized defense" that would turn into numerous minitrials).  Plaintiff has failed to meet the predominance requirement of Rule 23(b)(3).

b.      Superiority

Plaintiff also fails to establish the superiority requirement of Rule 23(b)(3).  The superiority requirement asks a district court to determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3); *see also In re Cmty. Bank of N. Va.*, 418 F.3d 277, 309 (3d Cir. 2005).  One factor to consider in assessing the superiority requirement is "the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(D).  As explained above, given the individual inquiries that are associated with each payment made to each external employee on Plaintiff's damages model, managing this case as a class action would be untenable.  There is simply no common proof presented to the Court that supports Plaintiff's theory of liability or damages.

Accordingly, Plaintiff's request to certify her claims under the WPCL as a class action under Rule 23 will be denied.

## III.    DEFENDANT'S MOTION TO DECERTIFY

Defendant also seeks to decertify the conditionally certified collective action under the FLSA.  Plaintiff alleges that, on numerous occasions, Maxim failed to timely pay wages to her and the remaining opt-in Plaintiffs, in violation of  29 U.S.C. § 206(b).  Under the collective action provision of the FLSA, an employee alleging an FLSA violation can bring suit on behalf of "[her]self or themselves and other employees similarly situated."  29 U.S.C. § 216(b).  In 2014, Judge Bartle granted Plaintiff's request for conditional class certification as to "all home healthcare aids employed by Maxim in Pennsylvania and who were paid beyond scheduled pay dates that fell on or after April 10, 2011."  (Dec. 11 Mem. 9.)  Noting the light burden placed on plaintiffs at the conditional class certification phase, Judge Bartle concluded that Plaintiff had "made a modest factual showing" that "remote employees worked under a common policy

applicable to all home healthcare aides which resulted in a systematic failure by Maxim to meet the FLSA requirement of timely payment."  (*Id*. at 7.)  A significant amount of discovery occurred subsequent to Judge Bartle's decision granting conditional class certification of the FLSA class.  Based upon our thorough review of that discovery and the entire record before us, we are persuaded that decertification is warranted.

A.    **Legal Standard**

The Third Circuit prescribes a two-step process for certification of collective actions brought pursuant to the FLSA.  *Zavala v. Wal Mart Stores Inc*., 691 F.3d 527, 535 (3d Cir. 2012).  At the first step—conditional certification—the plaintiff must make a "modest factual showing" which requires the plaintiff to "produce some evidence, beyond pure speculation, of a factual nexus between the manner which the employer's alleged policy affected her and the manner in which it affected other employees."  *Id*. at 536 n.4 (citation and internal quotation marks omitted).  As stated above, Judge Bartle determined that Plaintiff had made this showing and granted conditional class certification.

At the second stage of FLSA certification, the district court, "with the benefit of discovery . . . makes a conclusive determination as to whether each plaintiff who has opted into the collective action is in fact similarly situated to the named plaintiff."  *Camesi v. Univ. of Pittsburgh Med. Ctr*., 729 F.3d 239, 243 (3d Cir. 2013) (citation omitted); *see also Zavala*, 691 F.3d at 534 ("[A]fter considering the claims and defenses of the parties and all the relevant evidence [the district court] must make a finding of fact that the members of the collective action are "'similarly situated.'"").  Plaintiff has the burden of demonstrating that each opt-in plaintiff is similarly situated to her by a preponderance of the evidence.  *Zavala*, 691 F.3d at 534.  "This

step may be triggered by the plaintiffs' motion for 'final certification,' by the defendants' motion

for 'decertification,' or, commonly, by both." *Camesi*, 729 F.3d at 243.

**B.      Analysis**

Defendant makes two arguments in support of decertification.  First, Defendant contends

that Plaintiff has failed to show that opt-in plaintiffs are similarly situated to her and to each

other.  In support, Defendant relies on arguments made in opposition to Plaintiff's request to

certify the WPCL class action.  Second, Defendant contends that the Court's evaluation of its

defenses—namely, whether each opt-in plaintiff is exempt under the FLSA companionship

services exemption—requires an individualized assessment that cannot be accomplished on a

class-wide basis.

In determining whether opt-in plaintiffs are similarly situated, the Third Circuit has

adopted the "ad-hoc approach."  *Zavala*, 691 F.3d at 536.  This approach "considers all the

relevant factors and makes a factual determination on a case-by-case basis."  *Id*.  In using this

approach to assess whether plaintiffs are similarly situated, courts look at:  "whether the

plaintiffs are employed in the same corporate department, division, and location; whether they

advance similar claims; whether they seek substantially the same form of relief; and whether

they have similar salaries and circumstances of employment."  *Id*. at 536-537.  In addition, opt-in

plaintiffs may be considered "dissimilar" if there are "individualized defenses."  *Id*. at 537.

Plaintiff has failed to show that opt-in plaintiffs are similarly situated to her, or that they

are similarly situated to each other.  They worked for at least four different Maxim offices, and

had different supervisors who maintained different requirements on how external employees

should report their time.  The evidence reveals that there was no overarching Maxim policy on

how employees were to report their time.  Some reported their time over the phone, some

reported by email, some mailed-in their time sheets, some faxed-in their time sheets, and some

hand-delivered their timesheets.  There was also no overarching Maxim policy on how

employees were paid.  Some offices paid external employees according to their scheduled hours

if those employees failed to timely submit timesheets.  Other offices did not pay external

employees until the actual reported time was turned in to the payroll officer.

Plaintiff was required to hand-deliver her time sheet, and was not paid until she did so.

However, Plaintiff has failed to show that the other opt-in plaintiffs were burdened by the same

requirements, or that there was a common Maxim policy dictating these requirements.  This is

fatal to class certification.  *See Kuznyetsov*, 2011 U.S. Dist. LEXIS 146056, at *24-26 (granting

motion to decertify and finding plaintiffs not similarly situated where 312 different supervisors

had discretion to implement the meal break policy, and "[c]onsequently, this factor exponentially

compounds the differences and individualized experiences that go to whether there was a

violation of the law, rather than creating consistency"); *Camesi*, 2011 U.S. Dist. LEXIS 146067,

at *24-25 (finding opt-in plaintiffs not similarly situated where they worked for different

supervisors, and were subject to different requirements on how to report time); *Blaney v.

Charlotte-Mecklenburg Hosp. Auth*., No. 10-592, 2011 U.S. Dist. LEXIS 105302, at *26

(W.D.N.C. Sept. 16, 2011) ("When alleged FLSA violations stem from the enforcement

decisions of individual supervisors, without a company-wide policy or plan directing those

enforcement decisions, collective treatment is not appropriate." (citation omitted)); *see also

Postiglione v. Crossmark, Inc*., No. 11-960, 2012 U.S. Dist. LEXIS 163615, at *24 (E.D. Pa.

Nov. 14, 2012) (denying conditional class certification because the "[e]vidence admitted at trial

is likely to be highly individualized and focused on the policies and instructions of the named plaintiffs' 38 different supervisors").[10]

Defendant also argues that the conditionally certified FLSA action should be decertified because determining whether each plaintiff is exempt under the FLSA companionship services exemption cannot be accomplished on a class-wide basis.  According to Defendant, the individualized nature of this defense supports decertification.  The FSLA precludes coverage for "any employee employed on a casual basis in domestic service employment to provide . . . companionship services for individuals who (because of age or infirmity) are unable to care for themselves."  29 U.S.C. § 213(a)(15).[11]

The FLSA Regulations during the relevant time period elaborate on the meaning of companionship services.   Specifically, it notes that "the term companionship services" includes "the provision of fellowship and protection for an elderly person or person with an illness, injury, or disability who requires assistance in caring for himself or herself."  29 C.F.R. § 552.6(a).  The term "companionship services" includes "the provision of care when the care is provided attendant to and in conjunction with the provision of fellowship and protection, and does not

---

[10] We also find persuasive that, under Plaintiff's damages model, four out of the eight opt-in plaintiffs would not have any claimed damages because they did not have more than one late payment in any given pay quarter.  (Thomson Report 4, Def.'s Class Cert. Resp. Ex. 44 ("Even among the current opt-ins in this matter, [Plaintiff's expert's] own exposure estimates show no damages for 4 of them.  Mary Arelt, Ebony Moore, Mohamed Sall, and Robin Scott have no potential damages based on [the expert's] estimates.").)  Plaintiff does not dispute this.

[11] In 2015, the Secretary for the Department of Labor issued a Final Rule amending the companionship services regulations to exclude caregivers who were employed by third-party employers.  Application of the Fair Labor Standards Act to Domestic Service, 78 Fed. Reg. 60454, 60455 (Oct. 1, 2013).  The change precluded third party employers, such as Maxim, to claim that they were exempt from the FLSA's wage requirements with respect to companionship service employees.  The time period encompassed by Plaintiff's claims all pre-date the changes to the regulations.  Therefore, Maxim may claim application of the companionship services exemption.  Plaintiff does not dispute this.

exceed 20 percent of the total hours worked per consumer and per workweek."  *Id*. at § 552.6(b).

The term "provision of care" means assisting individuals "with activities of daily living," which

include "dressing, grooming, feeding, bathing, toileting, and transferring" individuals, and

assisting with "tasks that enable a person to live independently at home (such as meal

preparation, driving, light housework, managing finances, assistance with the physical taking of

medications, and arranging medical care)."  *Id*.  Companionship services do not include

"medically related services."  *Id*. at § 552.6(c).

Plaintiff and opt-in Plaintiffs were home health aides that provided various in-home

services to Maxim clients.  Each opt-in Plaintiff testified that the actual job duties performed by

home health aides varied depending on the need of the individual clients.  (*See, e.g*., Moore Dep.

50-52 (testifying that the only way to determine what type of work a home health provided was

to look at the individual clients and their associated plan of care); Watson Dep. 89-90, Def.'s

Class Cert. Resp. Ex. 27).)  A determination of whether the work provided by an opt-in Plaintiff

satisfies the definition of companionship services is highly individualized.  Plaintiff contends

that determining whether the exemption applies is not individualized, and should not prevent

certification.  Plaintiff states that the Court can simply rely on general testimony of the job duties

of home health aides to conclude that the exemption does not apply.  However, Plaintiff does not

point to any general testimony or any common proof to support her contention.

In fact, many courts that have considered the companionship services exemption in the

context of collective action claims have concluded that the individualized nature of the inquiry

precludes certification.  *See, e.g*., *Cowell v. Utopia Home Care, Inc*., No. 14-736, 2016 U.S. Dist.

LEXIS 104495, at *17 (E.D.N.Y. Aug. 8, 2016) (denying conditional certification because "the

unique and individualized Plans of Care that are prepared for [the defendant's] patients, and

which [the defendant Home Health Aids] are required to follow, result in very fact-specific

inquiries that are not susceptible . . . to a similarly-situated person analysis that would support

the issuance of a collective action notice." (citation and internal quotation marks omitted));

*Severin v. Project OHR, Inc*., No. 10-9696, 2012 U.S. Dist. LEXIS 85705, at *19 (S.D.N.Y. June

20, 2012) ("[T]he question of whether an individual OHR home attendant is subject to the FLSA

companionship services exemption is not susceptible to generalized, classwide proof."); *Johnson*

*v. Bridges of Ind*., No. 10-153, 2010 U.S. Dist. LEXIS 103696, at *7-8 (S.D. Ind. Sept. 28, 2010)

(denying certification of collective action under FLSA because of the "individualized inquiry"

that would be required of each employee to determine whether the companionship services

exemption applies); *Threatt v. CRF First Choice, Inc*., No. 05-117, 2006 U.S. Dist. LEXIS

50934, at *45 (N.D. Ind. July 21, 2006) (granting decertification because the individualized

nature of analysis to determine whether the companionship services exemption applies "renders a

collective action completely unworkable"); *see also Camesi*, 2011 U.S. Dist. LEXIS 146067, at

*27-28 (granting decertification of FLSA action due to the individualized nature of the defenses,

including whether individual opt-in plaintiffs were exempt from the FLSA).

   Accordingly, Defendant's Motion to De-Certify the Conditionally Certified Class will be

granted.

## IV. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

   Finally, Defendant seeks summary judgment with respect to Plaintiff's FLSA claims.

Defendant contends that each of the opt-in Plaintiffs is a home health aide that performs non-

medical, and companionship services to Maxim clients.  According to Defendant, these opt-in

Plaintiffs are therefore exempt from the FLSA.  Because we have already granted Defendant's

request to decertify Plaintiff's FLSA collective class action, we limit our discussion of the summary judgment arguments to the only remaining Plaintiff in this case—Markisha Gordon.

### A.    Legal Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party.  *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   "[A] factual dispute is material only if it might affect the outcome of the suit under governing law."  *Id*.  The court must view the evidence in the light most favorable to the non-moving party.  *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).  However, "unsupported assertions, conclusory allegations, or mere suspicions" are insufficient to overcome a motion for summary judgment.  *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989)).

Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004).  If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."); *see also Matsushita Elec. Indus. Co., Ltd.*, *v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (noting that the nonmoving party "must do more than simply show that

there is some metaphysical doubt as to the material facts" (citation omitted)).  "Where the record

taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is

no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

    **B.**    **DISCUSSION**

       As noted above, the FSLA provides no protection to "any employee employed on a

casual basis in domestic service employment to provide . . . companionship services for

individuals who (because of age or infirmity) are unable to care for themselves."  29 U.S.C. §

213(a)(15).  Companionship services are "the provision of fellowship and protection for an

elderly person or person with an illness, injury, or disability who requires assistance in caring for

himself or herself."  29 CFR § 552.6(a).  It may include the "provision of care"—meaning the

assistance with activities of daily living such as dressing, grooming, feeding, bathing, toileting—

so long as those services do not exceed 20 percent of the total hours worked per week.  *Id*. at §

552.6(b).  Companionship services do not include medically-related services.

       Plaintiff contends that she does not meet the exemption because she provided medical

services to Maxim clients.  However, her own deposition testimony refutes this argument.

Specifically, Plaintiff testified as follows:

    Q:    And when you were working for Maxim – when you were working for
          Maxim's clients, you never provided the types of services that a nurse or
          another trained medical profession would provide, did you?

    A.    No.

    Q.    You provided companionship services?

    A.    Yes.

    Q.    You were a home health aide for Maxim?

    A.    Yes.

(Gordon Dep. 18.)

In addition, Plaintiff argues that she does not qualify for the companionship services

exemption because she spent more than twenty percent of weekly hours on household work.

Again, Plaintiff's own deposition testimony does not support this.  Specifically, she testified:

Q:      The weekly note provides all of the services you provided to the client?

A.      Yes.

Q.      And it includes everything you did?

A.      Yes.

Q:      And each of your weekly notes would demonstrate that 100 percent of
        your time was spent on companionship services?

A.      Yes.

Q.      And that zero percent of your time was spent, say, doing laundry for
        somebody else, or doing general household work not related to the
        patient's condition?

A.      No we didn't do that.

(*Id*. at 90.)

Plaintiff's entire Memorandum in opposition to summary judgment relies on evidence

related to the other opt-in Plaintiffs.  She fails to point to any evidence specifically about herself

as the named Plaintiff representative.  In addition, despite testifying that the services she

provided to clients would be stated specifically in her weekly notes, she failed to submit any of

those notes as evidence in opposition to summary judgment.  Plaintiff has failed point to a

genuine dispute as to any material fact with respect to the services she provided to clients, and

whether those services qualify under the companionship services exemption of the FLSA.  Based

upon her own testimony, Plaintiff provided exclusively companionship services to Maxim

clients.  As a result, Defendant Maxim is entitled to judgment as a matter of law with respect to Plaintiff Gordon's claims under the FLSA.

## V.        CONCLUSION

For these reasons, Plaintiff's Motion for Certification will be denied, Defendant's Motion to De-certify Conditionally Certified Collective Action Class will be granted, and Defendants' Motion for Summary Judgment will be granted.

An appropriate Order follows.


BY THE COURT:


_____

**R. BARCLAY SURRICK, J.**